SIMMS PETROLEUM COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

SIMMS OIL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

TRINITY DRILLING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 61496–61498. Promulgated August 15, 1933.

J. *Sterling Halstead, Esq.*, and *K. D. Morgan, Esq.*, for the petitioners.

*Eldon McFarland, Esq., Bruce A. Low, Esq., Arthur Clark, Esq.*, and *R. H. Transue, Esq.*, for the respondent.

1112

1114

OPINION.

*Issue No. 1.*

SEAWELL: The first issue involved is entirely one of fact, namely, the amount of losses to which the Simms Oil Co. is entitled on account of the abandonment or other disposition of certain oil leases in 1922, 1923, 1924, and 1925. The parties have stipulated that the Commissioner did not allow any cost basis on account of the acquisition of the leases in question on June 20, 1919, and accordingly

included in taxable income the entire proceeds, if any, arising from their disposition. We have found as a fact that the cost of the leases to the Simms Oil Co. was $972,012.94 and the parties have stipulated the percentage of such cost which is applicable to the leases abandoned in the several years referred to above. The losses allowable (to the extent material in these proceedings) will accordingly be determined on the basis of the cost as determined herein and the percentages of such cost as stipulated by the parties as applying to the several years referred to.

## Issue No. 2.

On this issue the error assigned in the petition is, first, that the Commissioner erred in failing to recognize a loss of $673,852.02 sustained by the Simms Petroleum Co. in 1923 through the disposal on December 31, 1923, of the stock owned by it in the Rowe Oil Corporation to the Simms Oil Co. The computation of the loss was set out in the petition as follows:

| | |
|---|---:|
| Cost of the Rowe Oil Corporation stock | |
| Cash | $598,137.49 |
| 17,000 shares of Simms Petroleum Co. at an alleged value of $53 per share | 901,000.00 |
| Total | $1,499,137.49 |
| Capital contribution of Simms Petroleum Co. to Rowe Oil Corporation resulting from forgiveness of indebtedness | 356,767.77 |
| | $1,855,905.26 |
| Less: Consideration named in the contract of Simms Petroleum Co. with Simms Oil Co. for the sale of the Rowe Oil Corporation stock | 1,182,053.24 |
| Alleged loss sustained | $673,852.02 |

It is further contended that the Simms Oil Co. sustained a loss on the same day of $1,227,542.45 as a result of the liquidation and dissolution of the Rowe Oil Corporation, computed as follows:

| | |
|---|---:|
| Cost of Rowe Oil Corporation stock | $1,182,053.24 |
| Indebtedness of Rowe Oil Corporation to Simms Petroleum Co. assumed by Simms Oil Co. | 145,158.59 |
| | $1,327,211.83 |
| Less: Net fair market value (exclusive of above indebtedness) of assets of Rowe Oil Corporation distributed in complete liquidation of Rowe Oil Corporation on December 31, 1923 | 99,669.38 |
| Alleged loss sustained | $1,227,542.45 |

In considering this issue it should be observed at the outset that the year in which the alleged losses occurred is not before the Board, but what the petitioners desire is to use such losses in increasing or

creating net losses in 1923 which may be carried forward and allowed as deductions in computing net income for 1925. Further, it should be kept in mind that at the time the transactions in question took place the Simms Petroleum Co. owned all the capital stock of the Simms Oil Co. and the Rowe Oil Corporation, and the three corporations filed a consolidated return for 1923. While a loss was claimed in the petition for the Simms Petroleum Co., as set out above, no mention is made of such loss in their brief, but the entire argument advanced is on account of the loss to the Simms Oil Co. In any event, we think it clear that whatever net loss may have been sustained by the Simms Petroleum Co., either as a result of the transactions here referred to or otherwise, may not be availed of by it in 1925 under the provisions of section 206 of the Revenue Act of 1926, since the Simms Petroleum Co. had no income in that year against which such net loss might be applied. In other words, a net loss sustained by a member of an affiliated group may not be availed of in a subsequent year for an amount greater than its own income in such subsequent year. *Woolford Realty Co.* v. *Rose*, 286 U.S. 319; *Swift & Co.* v. *United States*, 38 Fed. (2d) 365; *New Castle Leather Co.*, 26 B.T.A. 282; affd., 65 Fed. (2d) 294; *Delaware & Hudson Co.*, 26 B.T.A. 520; affd., 65 Fed. (2d) 292; and *Sailors Brothers Co.*, 26 B.T.A. 700.

Nor can we agree with the petitioners that the loss which occurred on account of the liquidation of the Rowe Oil Corporation is one which was sustained by the Simms Oil Co. In short, what occurred was that the Simms Petroleum Co. acquired the entire capital stock of the Rowe Oil Corporation in 1919 and 1920 and held such stock until December 31, 1923, when it determined to liquidate the Rowe Oil Corporation. At the same time the Simms Petroleum Co. owned the entire capital stock of the Simms Oil Co. On December 31, 1923, the net value of the assets of the Rowe Oil Corporation was $99,069.38, exclusive of an indebtedness to the Simms Petroleum Co. of $145,767.77, which, if taken into consideration, would show liabilities in excess of assets of approximately $46,000. Regardless of the lack of value attaching to the assets of the Rowe Oil Corporation, the Simms Petroleum Co. entered into a contract with its other wholly owned subsidiary, the Simms Oil Co., whereby the latter would pay to the parent $1,182,053.24 for the assets of the Rowe Oil Corporation in addition to assuming the liability of the Rowe Oil Corporation to the Simms Petroleum Co. On the same day the Rowe Oil Corporation liquidated to the Simms Oil Co. and thereupon dissolved. Of course, if we would view the situation as the petitioners would have us view it, namely,

in its separate aspect as an acquisition of the stock of the Rowe Oil Corporation by the Simms Oil Co. and the liquidation of the former corporation to the latter, a loss on the part of the Simms Oil Co. would be said to have occurred in the amount of the difference between the cost of the stock to the Simms Oil Co. and the net value of assets received (*Riggs Nat. Bank*, 17 B.T.A. 615; affd., 57 Fed. (2d) 980), but we are convinced that what occurred can not be looked at in that manner. Prior to December 31, 1923, there was no apparent corporate connection between the Rowe Oil Corporation and the Simms Oil Co. other than might be said to exist because of a common parentage in the form of the Simms Petroleum Co., but such a relationship does not alter the fact that each of the corporations is separate and distinct and each corporation in an affiliated group must be looked at as a separate taxpayer. Cf. *Woolford Realty Co.* v. *Rose, supra,* and *Swift & Co.* v. *United States, supra.* In short, what may be carried forward in the form of a net loss by each member of an affiliated group (after appropriate use of such net loss in determining the consolidated net income for the year in which the loss occurred) is its own net loss and not the loss either of the group or of some other member.

When considered in the foregoing manner we fail to see how it can be said that the Simms Oil Co. sustained a net loss through the liquidation of the Rowe Oil Corporation in 1923 which may be carried forward and allowed as a deduction in computing its net income for 1925. Certainly a situation here exists for an application of the well recognized principle in tax cases that substance should prevail over form, since in the merest form only can it be said that the Simms Oil Co. sustained a loss through the transaction in question. Obviously, the Simms Oil Co. was acting merely as the nominee of the Simms Petroleum Co. in effecting the liquidation and dissolution of the Rowe Oil Corporation, and the transfer of the Rowe Oil Corporation stock from the Simms Petroleum Co. to the Simms Oil Co. was in no sense an arm's length transaction. To recognize such a loss as the loss of the Simms Oil Co. would be tantamount to the recognition of a loss created without regard to the realities of the situation. How the consideration named in the contract between the Simms Petroleum Co. and the Simms Oil Co. was arrived at does not appear, but apparently it might well have been any other amount, large or small, which the exigencies of the occasion or the desires of the parties might have dictated. But even if we should overlook the evident fact of nominee relationship existing on the part of the Simms Oil Co., would it not be a most unusual situation for a deductible loss to arise on account of the acquisition of a negative quantity? We think so. On the whole, we are of the opinion that whatever

deductible loss arose on account of the transactions in question was that of the Simms Petroleum Co. and, as we pointed out under a discussion of another phase of this issue, since that corporation had no net income in 1925, any net loss which arose in 1923 may not be availed of either by itself or the other members of the group in 1925.

*Issue No. 3.*

The errors assigned on this issue are that the Commissioner erroneously included certain amounts in the income of the Simms Oil Co. which were paid to the former stockholders of the Clayton Co. as set out in our findings. A brief recital of the facts, which are somewhat complicated by the various corporations and contracts involved, should make the issue clear. In 1922 the Clayton Co. secured certain rights from the Gasoline Co. to crack gasoline under patents owned by the latter corporation. Shortly thereafter the Clayton Co. assigned some of the rights so received to the Atlantic Co. under a contract which provided that the Clayton Co. would receive some of the royalties to be paid by the Atlantic Co. to the Gasoline Co. On May 14, 1922, and before any amount had become payable under the foregoing arrangements, the Simms Petroleum Co. entered into an agreement with Murphy & Co., owners or in control of some two thirds of the stock of the Clayton Co., for the acquisition of stock of the Clayton Co. In addition to the amount stated in the agreement to be paid for the stock, it was provided that all sums to be paid the Clayton Co. under its royalty arrangements with the Gasoline Co. and the Atlantic Co. would become the property of the stockholders of the Clayton Co. who were stockholders of record of such company immediately prior to the transfer of the stock to the Simms Petroleum Co. By July 2, 1925, the Simms Petroleum Co. had acquired 91.1 percent of the Clayton Co. stock under the agreement with Murphy & Co. and at that time the Simms Petroleum Co. owned the entire capital stock of the Simms Oil Co. On July 2, 1925, the Clayton Co. authorized the sale and transfer of its assets to the Simms Oil Co. as of June 30, 1925, and such authorization was carried out. In such sale the Simms Oil Co. took over the assets and assumed the liabilities of the Clayton Co. and also obligated itself to pay $861,872.71 to the Simms Petroleum Co. In addition the Simms Oil Co. accepted or acquiesced in the arrangement by which any payments to be made on account of the assignment of rights to the Atlantic Co. would be paid to the former stockholders of the Clayton Co. Between May 14 and December 28, 1925, all the outstanding stock of the Clayton Co. was acquired by the Simms Petroleum Co. pursuant to its contract with Murphy & Co., and on December 28, 1925, the Clayton Co. was formally dissolved.

As payments became due and payable under the assignment of rights by the Clayton Co. to the Atlantic Co. they were made to the parties who it was agreed should receive them, namely, they were eventually lodged in the hands of the former stockholders of the Clayton Co.

Our question is whether the Commissioner erred in including the foregoing payments in the taxable income of the Simms Oil Co., the successor in interest of the Clayton Co. If the payments had been made to the Clayton Co. in the ordinary course of events the amounts so paid would have constituted income; in other words, the Clayton Co. had an income-producing asset in the form of a contract, the income from which would have been taxable to it. Further, no question is raised that the income would not have likewise been taxable to the Simms Oil Co., the successor in interest of the Clayton Co., had it not been for the contract which was entered into for the benefit of the old stockholders of the Clayton Co. Our question is whether as a result of the agreement between Murphy & Co. (representing the old stockholders) and the Simms Petroleum Co. there was such a change in the status of the income to be received that it would be taxable to the old stockholders without first having become the income of the Simms Oil Co.

The major contention advanced by the petitioners is that the contracts of the Clayton Co. with the Gasoline Co. and the Atlantic Co. were a contingent claim which was distributed as a dividend in kind to the stockholders of the Clayton Co. and the proceeds thereof were not, in any event, income of the Simms Oil Co. Admittedly, there is much that may be said in support of such a proposition, but we think such a conclusion overlooks certain basic corporate principles and certain important facts which are present in the case at bar. In the first place, the contracts of May 14 and June 10, 1925, did not have the Clayton Co. as a party; they were between Murphy & Co., which either owned a majority of the stock of the Clayton Co. or represented a majority of its stockholders, and the Simms Petroleum Co., which was buying the Clayton stock. That a corporation is separate and distinct from its stockholders and that a corporation owns the corporate assets rather than its stockholders are too well established to require citation of authority in support thereof. Accordingly, we fail to see why the position of the Clayton Co. as a separate taxable corporate entity was in any manner changed as a result of contracts to which it was not a party; the royalty contract remained as its asset and any income to be derived therefrom would have been taxable to it.

So far we do not think the petitioners seriously question that a distribution in kind had not taken place, but they say that the action of the Clayton Co. in connection with the transfer of its assets to the

Simms Oil Co. and its liquidation and dissolution amounted to a ratification of the stockholders' contracts with the Simms Petroleum Co. and thus completed the action necessary for an effective distribution in kind of the royalty contract to the old Clayton stockholders. We are constrained to disagree. It is true that the trilateral agreement of the Simms Petroleum Co., the Simms Oil Co., and the Clayton Co. specifically recognizes the contract as to the payments to the old stockholders and the same is true of the resolution adopted by the board of directors of the Clayton Co. for the transfer of its assets to the Simms Oil Co., but the fact remains that the asset itself was transferred to, and became the property of, the Simms Oil Co. At that time no income had accrued or become payable under the royalty contract in question. Even, therefore, if we agree that the contract between Murphy & Co. and the Simms Petroleum Co. had been acquiesced in and accepted by the Clayton Co. and the Simms Oil Co., we have nothing more than an assignment of income to arise in the future, which has long been recognized as taxable to the assignor when it arises. *Bing* v. *Bowers*, 22 Fed. (2d) 450, and *Hazel T. Power*, 23 B.T.A. 428; affd., 61 Fed. (2d) 625; certiorari denied, 288 U.S. 612. Certainly, if a dividend in kind had been intended, we see no reason why it could not have been accomplished through the assignment of the asset itself instead of retaining what seems like a most cumbersome way of having the income pass through the several hands before reaching the old Clayton stockholders. Under the petitioners' theory, the Simms Oil Co. became a mere stakeholder with no interest whatsoever in the contract or its proceeds other than to turn the proceeds over to the old stockholders. The extent to which that proposition is true we shall not attempt to determine, though the more reasonable view would seem to be that for some reason the Simms interests desired to retain a measure of control over the royalty contract. Whether the retention of the contract meant some possible benefit to the Simms interest does not appear, though it is difficult to conceive that any other reason would have prompted the action taken. Further, the parties to the contracts seemed to have recognized at least the possibility that the income under the royalty contract would be taxable to the Simms Oil Co., since it was provided that the amount to be distributed to the old stockholders was the amount paid by the Atlantic Co. " less Federal income taxes, payable in respect thereto." The course pursued was in accordance with that understanding, namely, the Simms Oil Co. retained an amount estimated as sufficient to cover the Federal taxes and the balance was distributed. In any event, it is clear that the royalty contract passed to the Simms Oil Co. and we can see no basis under our scheme of taxation by which the income derived therefrom would

not be taxable to it even though it distributed such income in accordance with a preexisting contract to persons who were not its stockholders at the date of distribution.

The further contention is made that even if it should be held that the amounts in question are taxable to the Simms Oil Co., in any event two amounts which were shown in our findings as having been credited on the books of the Gasoline Co. to the Clayton Co. on December 21 and December 31, 1925, but were not paid by the Gasoline Co. until January 2, 1926, were erroneously included by the Commissioner in taxable income for 1926, when they should have been included in taxable income for 1925. The Commissioner maintains that the position as set out in the deficiency notice is correct, though he pleads affirmatively that in the event the two amounts should be taxed in 1925 instead of 1926, the deficiency for 1925 should be increased accordingly. The answer to the question rests upon a determination whether the amounts were constructively received in 1925 when the credits to the Clayton Co. were placed upon the books of the Gasoline Co. The Commissioner's various regulations which have been promulgated under the several revenue acts (including art. 51 of Regulations 69), as well as numerous court and Board decisions, have applied the principle that the doctrine of constructive receipt is inapplicable unless the amount in question is unqualifiedly subject to the demand of the party who would receive the same. Certainly, we can not say, because the amounts were credited to the Clayton Co. by the Gasoline Co., that they therefore became unqualifiedly subject to the demands of the Clayton Co. prior to their payment. The most that can be said is that the crediting was evidence that the Gasoline Co. was living up to its contract and the same might be said of the payments by the Atlantic Co. to the Gasoline Co., but we are unwilling to say from such evidence that the amounts thereby became unqualifiedly subject to the demand of the party to whom credited.

## Issue No. 4.

The error assigned under this issue relates to the same transaction as the previous issue and has for its ultimate question the basis for depreciation by the Simms Oil Co. of the assets received by it through the liquidation of the Clayton Co. on July 2, 1925. More specifically, the question is whether the cost to the Clayton Co. or the cost to the Simms Oil Co. as represented by the fair market value of the depreciable assets at the date of liquidation of the Clayton Co. is to be used as the basis for depreciation by the Simms Oil Co.

The position of the Commissioner is that there was here a reorganization (a merger) within the meaning of that part of section

203 (h) (1) of the Revenue Act of 1926 which defines a reorganization as " a merger or consolidation (including the acquisition by one corporation of  *  *  *  substantially all the properties of another corporation)" and that accordingly the case is governed by section 204 (a) (7) and (c), which provides for the use of cost to the transferor corporation as the basis for depreciation to the corporation to which depreciable assets are transferred. The particular type of reorganization which he contends occurred was a merger, and in support of this position he relies on a statement in *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 57 Fed. (2d) 188; affd., 287 U.S. 462, where it is stated that " In a merger one corporation absorbs the other and remains in existence while the other is dissolved."

It is of course true that when two corporations merge one corporation absorbs the other and remains in existence while the other is dissolved, and in this case the assets of one corporation were taken over by another, its liabilities were assumed and thereafter it was dissolved, while the transferee corporation remained in existence, but we do not understand that such a transaction constitutes the character of absorption and continuation necessary for a merger within the meaning of the statute. For example, if after the Simms Petroleum Co. had acquired 91.1 percent of the Clayton Co., the Simms Petroleum Co. had liquidated the Clayton Co., taking over its assets and assuming its liabilities, we do not understand that a merger would have arisen any more than there occurred in the case of *Riggs National Bank*, *supra*, where one corporation which owned all the stock of a second corporation caused the second corporation to be dissolved and took over its assets. In that case the reasoning here advanced by the Commissioner would result in a merger being held to have occurred, but the Board held that the liquidation of the subsidiary gave rise to a deductible loss on the part of the parent. Cf. *Aluminum Goods Mfg. Co.* v. *Commissioner*, 56 Fed. (2d) 568 (reversing *Aluminum Goods Mfg. Co.*, 22 B.T.A. 1); affd., 287 U.S. 544. In the case at bar the Simms Petroleum Co. was not even affiliated with the Clayton Co. since it owned less than 95 percent of its stock, and with all the more reasoning it would be said that a basis for gain or loss would arise on account of such liquidation. There was also no continuation of stock interest between the Clayton Co. and the Simms Petroleum Co., that is, none of the old stockholders of the Clayton Co. were or became stockholders of the Simms Petroleum Co.

The liquidation here, however, was not of the Clayton Co. to the Simms Petroleum Co., but instead it was one step removed therefrom, namely, to the Simms Oil Co., whose entire capital stock was owned by the Simms Petroleum Co., and from the common owner-

ship it is urged that there was a merger in which more than an 80 percent interest remained in the same hands, namely, the Simms Petroleum Co. We disagree and can see no more reason for saying that a merger occurred than in the suppositious case which we set out above. The most that can be said is that the resolution of the Simms Petroleum Co., dated July .1, 1925, and providing for the transfer of assets in question, stated that it seemed advisable to have the Simms Oil Co., its operating subsidiary which was engaged in a line of business similar to that of the ·Clayton Co., take over the assets of the Clayton Co. and carry on refining and distributing operations such as that corporation previously carried on. But we do not understand that such action contemplated any merger of the corporate life of the Clayton Co., a Delaware corporation, with that of the Simms Oil Co., a Texas corporation, other than might appear in any case of an outright acquisition of the assets of one corporation by another. The ownership of the assets of the Clayton Co. passed completely to the Simms Oil Co. and the Clayton Co. was thereafter dissolved. There is not even the common contention as to whether what occurred constituted an intercompany transaction, since the Clayton Co. and the Simms Oil Co. were not affiliated when the transfer of assets occurred. Between July 2 and December 28, 1925, the Simms Petroleum Co. or the Simms Oil Co. acquired the minority interest under the same contract by which the other stock had been acquired, but such acquisition would not alter the affiliated status which existed on July 2, 1925. On the whole, we are of the opinion that what here occurred amounted to a liquidation of the Clayton Co. to the Simms Oil Co. and that the basis for depreciation for the Simms Oil Co. on account of the depreciable assets received is the fair market value of such assets at the time received. It accordingly follows that the additional depreciation stipulated by the parties on such basis should be allowed. See *Warner Co.*, 26 B.T.A. 1225; *Cortland Specialty Co.* v. *Commissioner*, 60 Fed. (2d) 937; certiorari denied, 288 U.S. 599.

### *Issue No. 5.*

While our evidence on this issue is not of the most satisfactory character in all of its details, we do not understand that there is any disagreement between the parties other than as to the amount of $82,827.60 on which the Commissioner has not allowed depreciation as shown in the stipulation set out in our findings on this issue. The Commissioner, while not agreeing to the correctness of our decisions, conceded in his brief that issues of this character have been decided on several occasions by the Board against his position and that accordingly, if the Board adheres to its prior rulings, the Simms Oil Co. is entitled to depreciation on the item in question.

*A. T. Jergins Trust*, 22 B.T.A. 551; *Petroleum Exploration*, 23 B.T.A. 890 (reversed by the circuit court of appeals, *Commissioner v. Petroleum Exploration*, 61 Fed. (2d) 273, and certiorari granted, November 14, 1932) ; *Albert W. Ziegler*, 23 B.T.A. 1091; and *Twin Bell Oil Syndicate*, 26 B.T.A. 165. Since our decisions in the above cited cases, however, the Supreme Court of the United States definitely and authoritatively settled the issue now being discussed in favor of the contention of the Commissioner by affirming the decision of the United States Circuit Court of Appeals of the Fourth Circuit in *Petroleum Exploration* v. *Commissioner*, 288 U.S. 467, referred to above. See also *Commissioner* v. *Jergins Trust*, 288 U.S. 508, and *United States* v. *Dakota-Montana Oil Co.*, 288 U.S. 459, in which latter case the Court said:

> It is true that the Board of Tax Appeals in construing the 1924 and 1926 Acts has held that capitalized drilling costs are subject to a depreciation rather than a depletion allowance. *Jergins Trust Co.* v. *Commissioner*, 22 B.T.A. 551; *Ziegler* v. *Commissioner*, 23 B.T.A. 1091; *P. M. K. Petroleum Co.* v. *Commissioner*, 24 B.T.A. 360. But these cases were all decided after the enactment of the 1926 Act and did not consider the administrative and legislative history, which we think decisive.

The decisions of the Supreme Court above cited are controlling and are determinative of this fifth issue in favor of the contention of the Commissioner that the amounts expended during 1926 for drilling productive oil wells are recoverable through depletion rather than by depreciation allowances.

### Issue No. 6.

The final issue, as to whether a net loss sustained by the Simms Petroleum Co. for the year 1923 may be carried forward and allowed as a deduction in computing consolidated net income of the several petitioners for 1925, when the Simms Petroleum Co. sustained a loss for 1925, is fully covered, and decided adversely to the carrying forward of such a net loss, in our discussion of issue No. 2. It accordingly follows that the Commissioner is sustained on this issue.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*